# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| JOSEPH CROGNALE, Derivatively on Behalf of BLACKROCK, INC., <br><br> Plaintiff, <br><br> v. <br><br> LAURENCE D. FINK, MARTIN S. SMALL, GARY S. SHEDLIN, PAMELA DALEY, GREGORY J. FLEMING, WILLIAM E. FORD, FABRIZIO FREDA, MURRY S. GERBER, MARGARET L. JOHNSON, ROBERT S. KAPITO, CHERYL D. MILLS, KATHLEEN MURPHY, AMIN H. NASSER, GORDON M. NIXON, ADEBAYO OGUNLESI, KRISTIN C. PECK, CHARLES H. ROBBINS, HANS E. VESTBERG, SUSAN L. WAGNER, and MARK WILSON, <br><br> Defendants, <br><br> -and- <br><br> BLACKROCK, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No. 6:26-cv-00085 <br><br> JURY TRIAL DEMANDED <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT** |

Plaintiff Joseph Crognale ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The Complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"), news reports, press releases, publicly filed complaints, including *State of Texas, et al. v. BlackRock, Inc., et al.*, Case No. 6:24-cv-00437-JDK (E.D. Tex.) (the "Antitrust Action"), the August 1, 2025

Memorandum Opinion and Order denying in large part defendants' motion to dismiss the Antitrust Action (the "Decision"), and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant BlackRock, Inc. ("BlackRock" or the "Company") against certain of its officers and directors for violation of § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breach of fiduciary duty, and unjust enrichment. The wrongdoing alleged herein caused substantial damage to BlackRock's reputation, goodwill, and standing in the business community and exposed BlackRock to substantial potential liability for violations of various laws and the costs associated with defending itself. This action seeks to remedy wrongdoing committed by BlackRock's officers and directors from at least March 29, 2021, through the present (the "Relevant Period").

2.      For at least the past four years, BlackRock employed a systematic and coordinated mechanism to suppress coal output across the industry through its substantial ownership stakes combined with aggressive stockholder activism. Having acquired between 4.09% and 15.56% of every major publicly traded U.S. coal producer—including 13.62% of Peabody Energy and 15.01% of Arch Resources, which together control 63.5% of the South Powder River Basin ("SPRB") coal market—BlackRock leveraged these holdings to exert controlling influence over management decisions. BlackRock did not act as a passive investor. Rather, it actively used proxy voting, board engagement, and coordinated pressure campaigns to force coal companies to adopt production-reduction targets aligned with net zero emissions goals. Through its participation in Climate Action 100+ and the Net Zero Asset Managers Initiative, BlackRock publicly committed to implementing a stewardship and engagement strategy with a clear escalation and voting policy consistent with achieving net zero emissions by 2050, which required coal production to decline

over 58% by 2030 according to the International Energy Agency roadmap that BlackRock explicitly adopted.

3.      BlackRock bullied coal producers to take these actions by aggressively and publicly taking anti-coal positions and using its voting powers. BlackRock enforced these output reductions through multiple, coordinated tactics. First, BlackRock used proxy voting to oppose directors at coal companies that failed to commit to emissions reduction targets. For example, at the October 2021 meeting for Whitehaven Coal, BlackRock voted against all directors up for election because the company's disclosures did not include greenhouse gas reduction targets or alignment with net zero emissions by 2050. Second, BlackRock demanded that coal companies disclose their planned thermal coal production and Scope 3 Category 11 emissions, effectively revealing each company's future production plans to competitors and enabling BlackRock to monitor compliance with output restrictions. Third, BlackRock conducted extensive engagement campaigns, reporting over 1,250 engagements with portfolio companies regarding climate and natural capital in 2023–2024 alone. These engagements gave BlackRock privileged access to management and boards, whereby it pressured executives to reduce coal output or face removal. As Climate Action 100+ representative Mindy Lubber explicitly stated, "If companies aren't willing or able to respond to the challenge of moving towards a net zero transition, we will look for new leadership. . . . There may be board directors who don't feel compelled or have the expertise to get this transition done—but they must then make way for those that do."

4.      BlackRock's coordinated pressure campaign succeeded in suppressing coal output precisely as intended. Between 2019 and 2022, the publicly traded coal companies in which BlackRock held substantial stakes reduced thermal coal output by 19.2%, from 295.2 million tons to 238.5 million tons. In the SPRB market specifically, public companies controlled by BlackRock

and its co-conspirators reduced output by 18.2%, a reduction of 33.8 million tons. This artificial suppression of supply occurred despite rising demand for electricity and dramatically increasing coal prices. Privately held coal companies, in which BlackRock had no ownership stake, attempted to increase production by 6.1% to capture market share and capitalize on higher prices, but lacked sufficient scale, capital, and regulatory approvals to offset the coordinated output reductions by the BlackRock-controlled producers. The result was a classic cartel outcome: reduced industry-wide output despite rising prices.

5.      BlackRock pursued this output suppression scheme because it generated substantial profits across multiple dimensions of its business model. Most directly, by artificially restricting coal supply while demand remained strong, BlackRock inflated the value of its coal company holdings and the management fees it collected on those assets. The scheme created cartel-level profits for coal companies: Peabody Energy's profits soared 853.9% to $1.593 billion despite a 25.5% output drop, and since BlackRock held 13.62% of Peabody Energy and substantial stakes in all other major producers, these windfall profits directly enriched BlackRock through both increased asset values and percentage-based management fees.

6.      Second, BlackRock profited from premium fees on environmental, social, and governance ("ESG") investment products that marketed BlackRock's climate leadership. In 2024, BlackRock's assets under management ("AUM") increased to $11.6 trillion with record inflows of $641 billion in 2024 driven by ESG demand.

7.      Third, BlackRock collected fees from investors in purported non-ESG funds like the iShares Russell 2000 ETF with $70.8 billion in assets by falsely representing these funds would not follow ESG strategies, while secretly using voting power from these funds to advance its climate agenda.

8.    Fourth, BlackRock profited from suppressing coal by increasing electricity prices generally, thereby increasing returns across BlackRock's $170 billion in energy holdings including natural gas and renewable energy companies. BlackRock, The Vanguard Group, Inc. ("Vanguard"), and State Street Corporation ("State Street") collectively own approximately 22% of Exxon Mobil, 22.4% of Chevron, 27% of First Solar, and 22% of NextEra Energy, all of which benefited from reduced price competition from coal.

9.    The anticompetitive effects of BlackRock's output suppression scheme imposed severe harms on American consumers, the competitive coal market, and ultimately BlackRock's own stockholders. Thermal coal prices rose 25.52% between 2019 and 2022, from $27.54 to $34.57 per ton, while production dropped 19.2%—the inverse relationship between price and output that defines cartel behavior.[1] SPRB coal prices rose 21.2% during this period. These artificially inflated coal prices directly increased electricity generation costs for the approximately 150 power plants nationwide that rely on coal, including six major facilities in Texas: the Welsh Power Plant in Cason, the Fayette Power Project in La Grange, the Harrington Generating Station near Amarillo, Tolk Station in Muleshoe, the W.A. Parish Generating Station near Thompsons, and the Limestone Power Plant in Jewett.[2] These increased generation costs were passed through to American consumers in the form of higher utility bills at a time when families were already struggling with inflation and rising energy costs. The scheme thus extracted wealth from ordinary Americans to enrich BlackRock, its executives, and the coal-company management that complied with BlackRock's output restrictions.

---

[1] *See* Antitrust Action, ¶¶ 228-30.

[2] *Id.*, ¶ 61.

10.    BlackRock's conduct has exposed the Company to massive antitrust liability and financial exposure. Thirteen states—Texas, Alabama, Arkansas, Indiana, Iowa, Kansas, Missouri, Montana, Nebraska, Louisiana, Oklahoma, West Virginia, and Wyoming—have brought the Antitrust Action alleging violations of § 1 of the Sherman Act and § 7 of the Clayton Act based on BlackRock's coordinated output-reduction scheme. On August 1, 2025, the U.S. District Court for the Eastern District of Texas issued the Decision denying in large part the defendants' motion to dismiss the Antitrust Action, finding the plaintiffs had adequately alleged that BlackRock and its co-conspirators used their ownership stakes to form an output-reduction syndicate and substantially lessen competition in coal markets. The court specifically found that BlackRock's acquisitions of substantial shareholdings in competing coal producers gave it the power to influence management and that BlackRock used that power through proxy voting and otherwise to pressure coal producers to reduce production, even as coal prices rose significantly. The plaintiff states in the Antitrust Action seek injunctive relief including potential divestiture of shares, treble damages, restitution, and civil penalties up to $10,000 per violation under state antitrust laws. The litigation threatens BlackRock with potentially billions of dollars in liability, not to mention the enormous legal fees, management distraction, and reputational damage associated with defending a case alleging that BlackRock operated an illegal cartel to inflate prices at consumers' expense.

11.    The Director Defendants (as defined herein) breached their fiduciary duties by authorizing this coordinated conduct to suppress coal output in pursuit of environmental goals rather than maximizing returns, deceived investors about the Company's ESG practices, and exposed BlackRock to massive antitrust and consumer protection liability, including the ongoing Antitrust Action that survived motions to dismiss in August 2025. The Director Defendants authorized and oversaw this unlawful conduct in conscious disregard of the antitrust risks and in

breach of their fiduciary duties to BlackRock's stockholders. The directors knew or should have known that coordinating output reductions across competing coal producers through common ownership and stockholder activism posed obvious antitrust risks. Indeed, the very purpose of antitrust law is to prevent this exact type of coordinated conduct among horizontal competitors to restrict output and raise prices. Yet the Director Defendants not only authorized BlackRock's participation in Climate Action 100+ and the Net Zero Asset Managers Initiative—organizations whose explicit purpose was to coordinate investor pressure on coal companies to reduce production—but they also caused BlackRock to publicly announce its commitment to these initiatives and to engage in aggressive proxy voting and engagement campaigns to enforce output restrictions. The directors prioritized advancing their social and political climate agenda over their fiduciary obligation to act solely in the financial interests of BlackRock's stockholders, thereby exposing the Company to the substantial antitrust liability, legal costs, and reputational harm that have now materialized. By causing BlackRock to operate as the hub of an output-reduction cartel while simultaneously deceiving investors about the ESG nature of its purported non-ESG funds, the Director Defendants pursued their own ideological objectives at the expense of stockholder value, in violation of their fundamental duty of loyalty to the Company and its owners.

## JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 of the Exchange Act, 17 C.F.R. §240.14a-9, promulgated thereunder by the SEC. This Court also has subject-matter jurisdiction pursuant to 15 U.S.C. § 78aa(a) because this Court has "exclusive jurisdiction . . . of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder." This Court

has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a).

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

14.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Company maintains a place of business in this District; (ii) one or more of the defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

16.     Venue is also proper in this Court in accordance with 15 U.S.C. § 78aa(a) because defendants transact business within this District.

## THE PARTIES

**Plaintiff**

17.     Plaintiff is and has continuously been a stockholder of BlackRock during the wrongdoing complained of herein. Plaintiff will fairly and adequately represent the interests of the Company in enforcing and prosecuting his rights and has retained counsel experienced and competent in the prosecution of stockholder-derivative litigation.

**Nominal Defendant**

18.     Nominal Defendant BlackRock is a Delaware corporation, with its principal place of business located at 50 Hudson Yards, New York, New York. Since the Company's initial public offering in October 1999, the Company's shares have traded on the NYSE under the ticker symbol "BLK."

**Defendants**

19.     Defendant Laurence D. Fink ("Fink") has served as Chairman and as a member of BlackRock's Board of Directors (the "Board") and as Chief Executive Officer ("CEO") since he co-founded the Company in 1988 and leads the Global Executive Committee. As set forth in BlackRock's Proxy Statement on Form DEF filed with the SEC on April 4, 2025 (the "2025 Proxy"), Defendant Fink is responsible for senior leadership development, succession planning, defining, and reinforcing BlackRock's vision and culture, and engaging with key strategic clients, industry leaders, regulators, and policymakers. Defendant Fink received $36,667,500 in compensation from BlackRock in 2024.

20.     Defendant Martin S. Small ("Small") has been BlackRock's Chief Financial Officer ("CFO") since February 2023 and also serves as BlackRock's Global Head of Corporate Strategy. Defendant Small received $12,000,000 in compensation from BlackRock in 2024.

21.     Defendant Gary S. Shedlin ("Shedlin") served as BlackRock's CFO from 2013 until March 2025, when the Company announced his departure.

22.     Pamela Daley ("Daley") has served as a member of BlackRock's Board since January 2014. Defendant Daley serves as Chair of the Audit Committee, and a member of the Management Development & Compensation Committee ("MDCC"), Executive Committee, and Risk Committee. Defendant Daley received $394,201 in compensation from BlackRock in 2024.

23.    Defendant Gregory J. Fleming ("Fleming") has served as a member of BlackRock's Board since April 2025. He previously served as a BlackRock director from 2006 to 2009.

24.    Defendant William E. Ford ("Ford") has served as a member of BlackRock's Board since March 2018. Defendant Ford serves as Chair of the MDCC, a member of the Nominating & Governance Committee ("NGC"), and Executive Committee. He has served as CEO of General Atlantic since 2007 and is the company's Chairman. Defendant Ford received $373,391 in compensation from BlackRock in 2024.

25.    Defendant Fabrizio Freda ("Freda") has served as a member of BlackRock's Board since October 2012. Defendant Freda also serves as a member of the NGC. Defendant Freda received $343,243 in compensation from BlackRock in 2024.

26.    Defendant Murry S. Gerber ("Gerber") has served as a member of BlackRock's Board since 2000. He serves on the NGC and Executive (Lead Independent Director) Committees. Defendant Gerber received $443,398 in compensation from BlackRock in 2024.

27.    Defendant Margaret L. Johnson ("Johnson") has served as a member of the Board since March 2018. She serves on the Audit and Risk Committees. Defendant Johnson served on the MDCC from May 2019 to May 2024. Defendant Johnson received $372,158 in compensation from BlackRock in 2024.

28.    Defendant Robert S. Kapito ("Kapito") has served as a member of BlackRock's Board since March 1988 and as President of BlackRock since 2007. Defendant Kapito co-founded BlackRock in 1988. Defendant Kapito received $25,050,000 in compensation from BlackRock in 2024.

29.    Defendant Cheryl D. Mills ("Mills") has served as a member of BlackRock's Board since October 2013. She serves on the MDCC and NGC. Defendant Mills received $358,398 in

compensation from BlackRock in 2024.

30.     Defendant Kathleen Murphy ("Murphy") has served as a member of BlackRock's Board since April 2025.

31.     Defendant Amin H. Nasser ("Nasser") has served as a member of BlackRock's Board since July 2023. He serves on the NGC Committee. Defendant Nasser received $343,243 in compensation from BlackRock in 2024.

32.     Defendant Gordon M. Nixon ("Nixon") has served as a member of BlackRock's Board since July 2015. He serves on the MDCC and is Chair of the NGC. Defendant Nixon received $373,391 in compensation from BlackRock in 2024.

33.     Defendant Adebayo Ogunlesi ("Ogunlesi") has served as a member of BlackRock's Board since November 2024. Defendant Ogunlesi received $3,816,823 in compensation from BlackRock in 2024.

34.     Defendant Kristin C. Peck ("Peck") has served as a member of BlackRock's Board since September 2021. She serves on the NGC and MDCC. Defendant Peck received $352,043 in compensation from BlackRock in 2024.

35.     Defendant Charles H. Robbins ("Robbins") has served as a member of BlackRock's Board since April 2017. He serves on the Risk Committee. Defendant Robbins received $343,243 in compensation from BlackRock in 2024.

36.     Defendant Hans E. Vestberg ("Vestberg") has served as a member of BlackRock's Board since May 2021. He serves on the Audit and Risk Committees. Defendant Vestberg received $364,916 in compensation from BlackRock in 2024.

37.     Defendant Susan L. Wagner ("Wagner") has served as a member of BlackRock's Board since 2012. She is Chair of the Risk Committee and serves on the Executive Committee.

Defendant Wagner received $383,398 in compensation from BlackRock in 2024.

38.    Defendant Mark Wilson ("Wilson") has served as a member of BlackRock's Board since March 2018. He serves on the MDCC, Audit Committee, and Risk Committee. Defendant Wilson received $379,648 in compensation from BlackRock in 2024.

39.    The Defendants identified in ¶¶19, 22-38 are referred to herein as the "Director Defendants." Collectively, the Defendants identified in ¶¶19-38 are referred to herein as the "Individual Defendants."

40.    Because of their positions with Blackrock, the Individual Defendants possessed the power and authority to control the contents of BlackRock's reports to the SEC, press releases, and presentations to investors and analysts. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to the Company's confidential information, each of the Individual Defendants knew the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

41.    The Individual Defendants, as officers and/or directors of BlackRock, were bound by the Company's Code of Business Conduct and Ethics (the "Code"), which states that its purpose is to "conduct its business activities in the highest ethical and professional manner and to put client interests first."

42.     All BlackRock directors, officers, and employees are required to be familiar with the Code, comply with its provisions, and report suspected violations.

43.     In the section titled "Compliance with Laws and Regulations," the Code states that "BlackRock's global business activities are subject to extensive governmental regulation and oversight and it is critical that BlackRock and its employees comply with applicable laws, rules, and regulations, including those relating to insider trading."

**Duties Pursuant to the Audit Committee Charter**

44.     In addition to the duties set forth in the Code, Defendants Daley, Johnson, Vestberg, and Wilson, who serve and have served on the Audit Committee during the Relevant Period, owe and owed specific duties to BlackRock pursuant to the Audit Committee's Charter. Specifically, the Audit Committee Charter states that the purpose of the Audit Committee is to:

- assist the Board with oversight of:

    o    the integrity of the financial statements of the Company,

    o    the independent registered public accounting firm's (the "independent auditor") qualifications and independence,

    o    the performance of the Company's internal audit function and independent auditor, and

    o    the compliance by the Company with legal and regulatory requirements; and

- prepare an audit committee report as required by the rules of the SEC for inclusion in the Company's annual proxy statement.

45.     In the section titled "Responsibilities and Duties," the Audit Committee Charter states, in relevant part, that the Audit Committee has the following responsibilities and duties with respect to "Financial Statement and Disclosure Matters":

- Meet to review and discuss with management and the independent auditor the Company's annual audited financial statements, including reviewing the

Company's specific disclosures made in management's discussion and analysis, and other matters required by applicable PCAOB standards or under applicable legal, regulatory or NYSE requirements, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

- Review and discuss with management and the independent auditor the Company's internal controls report and the independent auditor's report on internal control over financial reporting prior to the filing of the Company's Form 10-K.

- Discuss with the independent auditor any critical audit matters from the current period audit prior to the filing of the Company's Form 10-K.

- Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements, including reviewing the Company's specific disclosures made in management's discussion and analysis, prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

- Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's application of accounting principles.

- Review and discuss with management and the independent auditor any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

- Review and discuss:

  o All critical accounting policies used.

  o Alternative treatments of financial information within generally accepted accounting principles with the independent auditor and management and the ramifications of the use of such alternative disclosures and treatments.

  o Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

- Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as any financial and non-financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally

(consisting of discussing the types of information to be disclosed and the types of presentations to be made).

- Discuss with management and the independent auditor the effect of regulatory and accounting developments as well as off-balance sheet structures on the Company's financial statements.

- On an annual basis, either separately or in a joint session with the Risk Committee, review the Company's program to manage its enterprise risks.

- Discuss with the independent auditor the matters required to be discussed by applicable generally accepted auditing standards, relating to the conduct of the annual audit and quarterly reviews, including, but not limited to any difficulties encountered in the course of the audit and review work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

- Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for Form 10-Ks and Form 10-Qs regarding any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

46.    In the same section, the Audit Committee Charter states, in relevant part, that the Audit Committee has the following responsibilities and duties with respect to "Compliance Oversight Responsibilities":

- Obtain from the independent auditor assurance that no report to the Board is required under § 10A(b) of the Exchange Act.

- Obtain reports from management and the Company's internal audit function that the Company and its subsidiary/foreign affiliated entities are in conformity with applicable legal requirements and the Company's Code of Business Conduct and Ethics. Review reports and disclosures of insider and affiliated party transactions. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Business Conduct and Ethics.

- Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission

by employees of concerns regarding questionable accounting or auditing matters.

- Receive reports of complaints, if any, regarding accounting and auditing matters. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

- Discuss with the Company's General Counsel legal matters that may have a material impact on the Company's financial statements or the Company's compliance policies and any matters involving potential or ongoing material violations of laws or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents.

- Prepare the audit committee report to be included in the Company's proxy statement when and as required by the rules of the Commission.

47.    In the same section, the Audit Committee Charter states, in relevant part, that the Audit Committee has the following responsibilities and duties with respect to "Governance":

- Make regular reports to the Board and maintain minutes of its meetings and records relating to those meetings and the Committee's activities.

- Annually review and reassess the adequacy of this Charter and recommend any proposed changes to the Board for approval.

- Annually review the Committee's own performance.

## BLACKROCK'S ANTICOMPETITIVE CONDUCT

**"Climate Initiatives" Create Obvious Antitrust Risk from Coordination in Coal Markets**

48.    Coal markets possess distinct, well-defined structures that render them vulnerable to influence by major asset managers such as BlackRock, State Street, and Vanguard—the Antitrust Defendants (as defined herein). These firms hold substantial, collective ownership in key publicly traded coal producers—typically between 25% and 35% of each company. This concentration of ownership allows them to shape corporate policies and suppress output, particularly through coordinated participation in climate initiatives.

49.     Climate Action 100+ and the Net Zero Asset Managers Initiative are investor-led climate initiatives through which institutional investors commit to using their ownership stakes to pressure portfolio companies to reduce greenhouse gas emissions and align with net zero goals. Climate Action 100+ coordinates engagement with the world's largest emitters and explicitly acknowledges that net zero means "coal production declines towards zero."

50.     The Net Zero Asset Managers Initiative requires signatories to "implement a stewardship and engagement strategy, with a clear escalation and voting policy" to achieve net zero across all AUM by 2050 and directs signatories to "immediately cease all financial or other support" to coal companies expanding production. BlackRock and State Street joined Climate Action 100+ in January 2020.

51.     The Antitrust Defendants, including BlackRock, joined the Net Zero Asset Managers Initiative in 2021. In fact, ***BlackRock and Vanguard joined on the exact same day (March 29, 2021)***—thereby publicly committing to coordinate their use of ownership stakes across competing coal producers to suppress output.

52.     Through these initiatives, the Antitrust Defendants leveraged their concentrated ownership to facilitate supply constraints, reduce competition, and inflate prices in coal markets. The result was artificially depressed coal output despite rising demand and skyrocketing prices— the hallmark of anticompetitive coordination.

**Markets in the Coal Industry**

53.     The Antitrust Defendants together control 30.43% of Peabody Energy, 34.19% of Arch Resources, and 32.87% of Black Hills Corporation ("Black Hills")—the three primary public producers that comprise 63.5% of total SPRB production, measured against the entire market

including all private producers.[3]

54.     This means that through their coordinated influence over just three public companies, the Antitrust Defendants effectively controlled nearly two-thirds of all SPRB coal production in 2022, which totaled approximately 240 million tons. The remaining 36.5% of SPRB production came from six privately held mines operated by companies including Eagle Specialty Materials, Navajo Transitional Energy Company, Kiewit Corporation, and Western Fuels Association, in which the Antitrust Defendants held no ownership stakes.[4]

55.     Similarly, in the broader thermal coal market, the eight public companies in which the Antitrust Defendants hold ownership stakes ranging from 8.3% to 34.19%—including NACCO Industries (10.85%), CONSOL Energy (28.97%), Alpha Metallurgical Resources (29.7%), Vistra Energy (24.94%), Hallador Energy (8.3%), and Warrior Met Coal (31.62%)—collectively account for 46% of total U.S. thermal coal production measured against the entire national market of 523.3 million tons, including all private and public producers.[5] The remaining 54% of thermal coal production came from privately held companies and other producers over which the Antitrust Defendants exercised no control.

56.     These market-share figures demonstrate that the Antitrust Defendants did not need to control the entire coal industry to substantially lessen competition and artificially inflate prices; rather, by coordinating their influence over less than half to two-thirds of production through strategically selected public companies, the Antitrust Defendants possessed sufficient market power to suppress industry-wide output, knowing that private producers lacked the scale, capital,

---

[3] *See* Antitrust Action, ¶¶ 60-62.

[4] *Id.*, ¶ 99.

[5] *Id*., ¶ 4.

regulatory approvals, and access to financing necessary to offset the coordinated output reductions imposed by the Antitrust Defendants on the public companies they controlled.

57.     Indeed, the Antitrust Action alleges that while privately held coal companies attempted to increase production by 6.1% in response to rising prices between 2019 and 2022—as competitive market participants would naturally do—these private producers were unable to capture sufficient market share to compensate for the 19.2% reduction in output by the public companies under the Antitrust Defendants' control, resulting in artificial scarcity, cartel-level pricing, and substantial harm to competition and consumers.[6]

<u>The SPRB Market: Structure, Vulnerability, and Exploitation</u>

58.     The SPRB, encompassing northeastern Wyoming and southeastern Montana, is the nation's largest coal-producing region and a prime example of a market uniquely susceptible to coordinated suppression.

59.     In 2022, the SPRB produced 260 million tons of coal—43.5% of all U.S. coal production—supplying approximately 150 power plants nationwide, including six major facilities in Texas: the Welsh Power Plant in Cason, the Fayette Power Project in La Grange, the Harrington Generating Station near Amarillo, Tolk Station in Muleshoe, the W.A. Parish Generating Station near Thompsons, and the Limestone Power Plant in Jewett.

60.     SPRB coal possesses unique characteristics that render it non-substitutable for power plants designed to burn it. With lower sulfur and sodium content than coal from competing U.S. basins (including the Illinois, Uinta, and Appalachian Basins), SPRB coal produces reduced emissions and enables more efficient plant operations.

---

[6] *Id.*, ¶ 229.

61.    SPRB coal's economical extraction through surface mining of thick seams results in the lower mining costs that coal mined in other parts in the nation. For example, SPRB coal's cost was $0.79 per million British Therman Units ("BTU") in early 2024, compared to $3.24 for Central Appalachian coal. With heat content between 7,710 and 9,410 BTU per pound, SPRB coal has become essential for the power plants that rely on it. Switching to alternative coal sources would require these facilities to incur prohibitive costs for enhanced pollution-control systems, extensive facility modifications, and new regulatory approvals.

The Thermal Coal Market: Structure, Vulnerability, and Exploitation

62.    In parallel, the thermal coal market remains exposed to similar pressures due to its need for reliable, large-scale supplies for energy production, where the eight publicly held coal producers (in which the defendants hold substantial stakes) are responsible for approximately 46% of total domestic coal production and significant shares of domestic thermal coal production.

63.    Contracts are commonly obtained through request-for-proposal mechanisms, augmented by spot markets; transport costs (often exceeding 50% of delivered prices) emphasize proximate sources. Plants cannot rapidly shift to natural gas, renewables, or nuclear because of construction investments and schedules, nor can utilities mitigate small price rises through wholesale acquisitions without sustaining the viability of such influences.[7]

**The Two Primary Coal Markets Are Uniquely Vulnerable to Coordinated Manipulation**

64.    The coal industry's structural characteristics (which are concentrated public ownership, high barriers to entry, inelastic demand, and limited substitutability), render it uniquely vulnerable to the coordinated manipulation that BlackRock, State Street, and Vanguard systematically executed.

---

[7] *Id.*, ¶¶ 71-73.

65. First, market structure enables coordination by powerful investors. Coal production is dominated by a small number of publicly traded companies in which the Antitrust Defendants hold substantial collective ownership—typically 25% to 35% of each company.

66. In the SPRB market, the Antitrust Defendants collectively control over 30% of the three major producers (Peabody Energy, Arch Resources, and Black Hills).

67. In the broader thermal coal market, the Antitrust Defendants hold similar concentrated stakes across eight public companies that together account for 46% of total U.S. coal production. This concentration of ownership, combined with the Antitrust Defendants' coordination through Climate Action 100+ and the Net Zero Asset Managers Initiative, gave defendants the power to dictate supply decisions across the industry.

68. Second, independent operators cannot offset coordinated production-suppression initiatives. While privately held coal companies exist, they lack the capital, infrastructure, and regulatory approvals necessary to rapidly increase production in response to artificially suppressed output by the Antitrust Defendants.

69. Third, power plants cannot quickly or economically switch fuels in response to coal-price increases. Plants designed to burn SPRB coal or thermal coal face prohibitive costs to convert to natural gas, renewables, or other coal types, including facility modifications costing hundreds of millions of dollars, new pollution-control systems, and years-long regulatory approval processes. This "demand inelasticity" means that when the Antitrust Defendants suppress coal output, utilities and consumers cannot avoid the resulting price increases by switching to alternatives.

**BlackRock's and Its Co-Conspirators' Substantial Percentages in U.S. Coal Companies**

70.    BlackRock is one the largest investors in global coal production. As of February 15, 2022, BlackRock's total investment in coal was $108.787 billion; Vanguard's, $101.119 billion; and State Street's, $35.736 billion.

71.    BlackRock, in particular, is the largest shareholder of six of the nine publicly traded coal companies (hereinafter, the "Coal Companies"), and the second largest of the remaining three:

| Antitrust Defendants' Ownership Interests in the Coal Companies (as of June 30, 2024) Percentage Ownership (Shareholder Rank) | | | | |
|---|---|---|---|---|
| | BlackRock | Vanguard | State Street | Total |
| Peabody Energy | 13.62% (1) | 11.18% (2) | 5.63% (4) | **30.43%** |
| Arch Resources | 15.01% (1) | 12.81% (2) | 6.37% (3) | **34.19%** |
| NACCO Industries | 5.88% (2) | 3.63% (3) | 1.34% (8) | **10.85%** |
| CONSOL Energy | 14.15% (1) | 8.94% (2) | 5.88% (5) | **28.97%** |
| Alpha Metallurgical Resources | 14.58% (1) | 9.58% (2) | 5.54% (3) | **29.70%** |
| Vistra Energy | 7.91% (2) | 12.57% (1) | 4.46% (4) | **24.94%** |
| Hallador Energy | 4.09% (2) | 3.01% (5) | 1.2% (11) | **8.30%** |
| Warrior Met Coal | 14.04% (1) | 11.38% (2) | 6.2% (3) | **31.62%** |
| Black Hills | 15.56% (1) | 12.04% (2) | 5.27% (3) | **32.87%** |

72.    BlackRock's acquisitions occurred primarily between December 2020 and June 2024, during which it alone acquired millions of additional shares across the Coal Companies, enabling coordinated influence over approximately 46% of total domestic coal production and 63.5% of the SPRB coal market.

73.    The Antitrust Defendants' anticompetitive schemes were successful, as evidenced by the manifest anticompetitive effects in the coal markets. Between 2019 and 2022, the publicly traded coal companies controlled by the Antitrust Defendants reduced thermal coal output by 19.2% (from 295.2 to 238.5 million tons) while prices increased 25.52% (from $27.54 to $34.57 per ton)—the inverse of normal competitive behavior. During this same period, privately held coal companies increased production by 6.1%, attempting to capitalize on rising prices, but lacked

sufficient scale to offset the Antitrust Defendants' coordinated suppression. Similarly, SPRB coal prices rose 21.2%, with public companies reducing output by 18.2% (33.8 million tons), while privately held firms increased by 6.1% (5 million tons). This artificial scarcity generated windfall profits for the Coal Companies in which Defendants held substantial stakes, resulting in cartel-level revenues and profits for defendants, with Peabody Energy's profits soaring 853.9% to $1.593 billion despite a 25.5% output drop, as well as higher management fees and investment returns for BlackRock, State Street, and Vanguard, while American consumers and businesses faced dramatically elevated energy costs.

**The Antitrust Defendants' 30% Ownership Created a Controlling Influence**

74.    The Antitrust Defendants' collective ownership stakes exceeding 30% in major coal producers gave them controlling influence over corporate decision-making and supply decisions, even though such ownership falls short of majority control. This influence derives from multiple structural and practical realities of corporate governance.

75.    First, in publicly traded companies with widely dispersed shareholdings, a 30% collective stake held by three coordinated institutional investors represents by far the largest voting block, as the remaining 70% of shares are typically fragmented among thousands of individual retail investors, mutual funds, pension funds, and other institutional investors who rarely coordinate their votes or engage actively with management.

76.    Second, corporate management knows that when stockholders controlling 30% of voting power speak with a unified voice—as BlackRock, Vanguard, and State Street did through their joint participation in Climate Action 100+ and the Net Zero Asset Managers Initiative— management must listen or face the very real threat of director removal, failed say-on-pay votes, and successful proxy contests.

77.    Third, SEC regulations recognize that ownership of merely 5% triggers enhanced disclosure requirements under Schedule 13D precisely because even a 5% stake conveys significant influence. BlackRock's ownership stakes of 10%, 12%, 15% (and higher) in many coal companies is widely recognized in corporate governance literature and legal precedent as sufficient ownership to exert substantial control over management decisions.

78.    Fourth, the Antitrust Defendants are not only the largest shareholders in each coal company, but they are consistently the top three shareholders across all major energy producers (of Exxon Mobil, owning 988 million shares or 22% of the outstanding shares; of Chevron, 413 million shares, or 22.4%; of Devon Energy, 170 million shares, or 27%; of First Solar, 29 million shares, or 27%; and of NextEra Energy, 454 million shares, or 22%) meaning no other investor or group of investors possessed comparable influence to counterbalance their coordinated pressure.

79.    Fifth, institutional investors like BlackRock possess privileged access to boards and management that retail shareholders do not enjoy; as BlackRock's own materials acknowledge, the Company engages in hundreds of direct discussions annually with portfolio company leadership, giving it the ability to shape corporate strategy behind closed doors before issues ever reach a proxy vote.

80.    Sixth, the threat of divestment—or even the mere possibility that BlackRock, Vanguard, or State Street might sell their substantial stakes—creates enormous pressure on management to comply with these investors' demands, as such a sale could crater a company's stock price and trigger covenant violations, credit-rating downgrades, or hostile-takeover attempts. Indeed, BlackRock's Chairman and CEO, defendant Fink, confirmed: "We are an active voice, we work with companies, but we need to work for the long-term interest." Pru Bennett, BlackRock's head of Asia Pacific corporate governance and responsible investment, added: "We actively

engage, we vote all our proxies. We're not just voting but have a lot of engagement with companies."

81.    Finally, the coordinated nature of the Antitrust Defendants' actions amplified their individual influence. For example, when BlackRock voted against all directors at Whitehaven Coal for failing to adopt net zero targets, management at other coal companies understood that similar retribution awaited them if they did not comply, and when the Antitrust Defendants jointly committed to net zero goals requiring 58% coal production cuts by 2030, coal-company management faced the stark choice of submitting to these demands or confronting a united front of their three largest shareholders, who collectively controlled 30-34% of voting power and had the demonstrated willingness to use proxy votes, engagement campaigns, and public pressure to remove non-compliant directors and executives.

82.    This combination of factors—concentrated ownership in a fragmented shareholder base, coordinated action among the top three investors, privileged access to management, the threat of divestment, SEC recognition of 5%+ stakes as significant, and documented willingness to use proxy voting to punish non-compliance—transformed the Antitrust Defendants' 30% collective ownership into effective controlling influence over corporate decision-making, including the critical supply decisions that determined coal production levels and directly impacted competition in the coal markets.

83.    The Antitrust Defendants' anticompetitive efforts were successful. Between 2019 and 2022, the publicly traded coal companies controlled by the Antitrust Defendants reduced thermal coal output by 19.2% while prices increased 25.52%—the inverse of normal competitive behavior. During this same period, privately held coal companies increased production by 6.1%, attempting to capitalize on rising prices, but lacked sufficient scale to offset the Antitrust

Defendants' coordinated suppression.

### BLACKROCK'S ESG POSITIONS AND STATEMENTS BY EXECUTIVES

84.    Under Defendant Fink's leadership, BlackRock historically positioned itself as a leader in ESG investing, often described in public discourse as "socially conscious" or "woke" due to its emphasis on sustainability, stakeholder capitalism, and social equity. This approach has drawn both praise for purportedly advancing responsible investing and criticism.

85.    BlackRock is able to use its immense financial leverage as the world's largest asset manager to coerce companies into adopting politically driven ESG policies that may not be in the best interest of BlackRock stockholders. They contend that pushing companies to reduce carbon emissions or increase diversity goes beyond traditional financial considerations. BlackRock's ESG push in particular has faced a strong backlash, primarily from conservative politicians and groups who see it as a form of "woke capitalism" or a politically motivated attempt to use financial power to advance a progressive agenda.

86.    The most fundamental criticism is that BlackRock's ESG policies (whether on the left or the right) represent a violation of its fiduciary duty to maximize financial returns for its clients. As a consequence, state treasurers and pension funds have divested from BlackRock, arguing that its ESG commitments harm the returns of their portfolios, particularly by boycotting or limiting investments in the fossil fuel industry.

87.    Nevertheless, Defendant Fink has publicly tied BlackRock's corporate purpose to advancing social goals beyond pecuniary gain. In his 2018 letter to CEOs, defendant Fink declared that "society is demanding that companies, both public and private, serve a social purpose," and that to prosper "every company must not only deliver financial performance, but also show how it makes a positive contribution to society."

88.    In 2020, defendant Fink announced that BlackRock would "place sustainability at the center of our investment approach," including "exiting investments that present a high sustainability-related risk, such as thermal coal producers," and using stewardship to enforce climate-aligned behavior at portfolio companies. In the same 2020 communication, BlackRock told clients it would remove, by mid-2020, the "public securities (both debt and equity) of companies that generate more than 25% of their revenues from thermal coal production" from its discretionary active portfolios, bake ESG analytics into the Company's Aladdin risk platform, and double ESG exchange-traded fund ("ETF") offerings while working with index providers to exclude high-ESG-risk businesses. BlackRock simultaneously tied its stewardship program to specific climate and social frameworks. It asked portfolio companies to report in line with the Sustainability Accounting Standards Board ("SASB") and the Task Force on Climate-related Financial Disclosures ("TCFD") and warned it would be "increasingly disposed to vote against management and board directors when companies are not making sufficient progress on sustainability-related disclosures."

89.    BlackRock also announced that it had joined Climate Action 100+—an investor coalition organized to pressure the world's highest emitters to align with the Paris Agreement—and that it would map engagement priorities to U.N. Sustainable Development Goals, including "Gender Equality" and "Affordable and Clean Energy," while moving to quarterly voting disclosure and prompt "vote bulletins" on high-profile meetings.

90.    BlackRock's leadership repeatedly framed climate change as a financial imperative requiring systemic action by companies and investors. Defendant Fink's 2020 letter asserted that "climate risk is investment risk," called for carbon pricing, and pledged that BlackRock would help "accelerate the low-carbon transition," including through public-private climate finance

partnerships.

91.    Although Defendant Fink later protested that "stakeholder capitalism is not woke," BlackRock continued to present ESG and stakeholder considerations as integral to corporate strategy and capital allocation, reinforcing that businesses should "play a role in decarbonizing the global economy."

92.    BlackRock's stewardship homepage confirms that such engagements and voting interventions are "core to our role as an asset manager and a fiduciary," and that BlackRock's stewardship teams (BIS and BAIS) actively press for "sound corporate governance and business practices" in line with these policies.

93.    Collectively, these pronouncements and actions—public social-purpose messaging, coal-exit standards in active funds, adoption of ESG as "the new standard for investing," adherence to the SASB/TCFD, joining investor climate coalitions, firearm-policy activism, board-diversity voting, and support for dissident climate-aligned directors—are consistent with Defendants' own admissions that BlackRock is a socially conscious, ESG-driven actor that deploys its ownership and stewardship tools to influence portfolio companies.

94.    These materials demonstrate that Defendants exploited ESG stewardship as a mechanism for anticompetitive coordination rather than genuine environmental concern. While publicly proclaiming that their climate initiatives served broader social goals, Defendants used those initiatives to suppress coal output across competing producers, enriching BlackRock through increased management fees, asset growth in ESG products, and enhanced market positioning. The costs of this coordinated conduct fell on American consumers through artificially inflated energy prices, on defrauded investors who purchased misrepresented "non-ESG" funds, and ultimately on

BlackRock's stockholders who now face antitrust litigation on behalf of thirteen state attorneys general and massive potential liability for treble damages, civil penalties, and injunctive relief.

### DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY DECEIVING BLACKROCK'S CUSTOMERS IN PURSUIT OF THEIR POLITICALLY MOTIVATED OUTPUT-REDUCTION SCHEME

95.     The Director Defendants breached their fiduciary duties by causing BlackRock to sell certain investment funds in a deceptive manner. BlackRock markets funds branded as "ESG" or "sustainable" (the "ESG Funds") and funds marketed without such labeling, with materials explicitly stating that ESG criteria would not alter the fund's investment objective or limit the range of companies in which the fund could invest ("non-ESG funds"). However, certain of its purportedly non-ESG funds were nevertheless driven by BlackRock's commitment to the anticompetitive scheme with State Street and Vanguard. BlackRock's commitments to reducing coal production would necessarily result in ESG strategies being employed within funds that BlackRock explicitly marketed as non-ESG.

96.     Thus, Defendants caused BlackRock to market its purported non-ESG funds in a manner that would lead a reasonable consumer to believe these funds would not buy, sell, vote, or otherwise use shares in publicly traded equities based on an ESG agenda.

97.     For instance, Defendants caused BlackRock's iShares Russell 2000 ETF—which held over $70.8 billion in assets as of August 30, 2024, including 3,452,470 shares of Peabody Energy, 470,631 shares of Arch Resources, 294,043 shares of Alpha Metallurgical Resources, 101,518 shares of NACCO Industries, 785,183 shares of CONSOL Energy, 691,815 shares of Hallador Energy, 1,385,312 shares of Warrior Met Coal, and 1,879,182 shares of Black Hills—to be marketed solely as an ETF seeking to track the investment results of an index composed of small-capitalization U.S. equities.

98.     Defendants marketed this ETF to consumers, and continues to do so, as a fund that does not seek to follow a sustainable, impact, or ESG investment strategy. While the investor fact sheet provides ESG metrics, Defendants caused the marketing materials to assure consumers, since at least March 2021, that these metrics do not change the fund's investment objective or constrain its investable universe, and there is no indication that a sustainable, impact, or ESG investment strategy will be adopted. Nothing in the fund's prospectus, to which the fact sheet refers investors, suggests or has suggested that the shareholdings will be used to advance an ESG agenda. However, they were used to advance defendant Fink's agenda.

99.     Defendants made identical deceptive representations in the marketing materials for other non-ESG funds, including: (i) BlackRock's iShares Russell 3000 ETF, which holds $13.7 billion in assets, including 30,699 shares of Peabody Energy, 5,008 shares of Arch Resources, 3,038 shares of Alpha Metallurgical Resources, 8,160 shares of CONSOL Energy, 10,167 shares of Hallador Energy, 14,628 shares of Warrior Met Coal, 92,474 shares of Vistra Energy, and 17,666 shares of Black Hills; and (ii) BlackRock's iShares Core S&P Mid-Cap ETF, which holds over 2.1 million shares of Black Hills.

100.    Defendants further caused the Company to issue false and misleading statements including that the "fund [that] does not seek to follow a sustainable, impact or ESG investment strategy." A reasonable consumer would interpret "investment strategy" to encompass engagement and proxy voting. Thus, when Defendants directed BlackRock to conduct ESG engagement using the power of its shares, they were implementing an ESG investment strategy that included the purportedly non-ESG funds.

101.    Defendants' statements that these BlackRock funds were not pursing an ESG investment strategy were false and are contradicted by BlackRock's climate commitments to

groups like Climate Action 100+ and Net Zero Asset Managers Initiative involving the implementation of a sustainable, impact, or ESG investment strategy across all BlackRock assets, even those implicating non-ESG funds.

102.    For example, as part of its ongoing Net Zero Asset Managers Initiative membership, Defendants directed BlackRock to comprehensively implement a stewardship and engagement strategy, with a clear escalation and voting policy, consistent with the ambition for all AUM to achieve net zero emissions by 2050 or sooner. These commitments are nonwaivable, as the Net Zero Asset Managers Initiative commitment ensures that several important actions—such as stewardship and policy advocacy—are comprehensively implemented. BlackRock's Net Zero Asset Managers Initiative commitment also includes a pledge to work in partnership with asset-owner clients on decarbonization goals, consistent with an ambition to reach net zero emissions by 2050 or sooner across all AUM, and to review its interim target at least every five years, with a view to ratcheting up the proportion of AUM covered until 100% of assets are included.

103.    BlackRock's 2021 TCFD report admitted that sustainability, including climate-related issues—from the integration of ESG factors into the Company's investment processes to sustainable investment strategies and investment stewardship priorities—is a critical component of the Company's overall business strategy and the objectives of senior management over which the Board has oversight. The 2022 TCFD report also admitted that sustainability, including climate-related issues, is a critical component of BlackRock's overall business strategy and the objectives of senior management over which the Board has oversight.

104.    That same report states that the Investment Subcommittee of the Global Executive Committee oversees ESG integration in BlackRock's company-wide processes.

105.    These admissions in BlackRock's TCFD reports, together with BlackRock's Net Zero Asset Managers Initiative commitment to comprehensively advance the net-zero agenda across all AUM, render false or misleading defendants' representations that purportedly non-ESG funds do not seek to follow a sustainable, impact, or ESG investment strategy.

106.    The Director Defendants caused BlackRock to make representations that contradicted its actual practices regarding proxy voting and engagements, particularly in relation to its commitments to sustainability and climate initiatives.

107.    When the Director Defendants directed BlackRock to join Climate Action 100+ in 2020, the Company publicly announced it would maintain independence in prioritizing engagements and voting proxies; however, this statement was false and misleading, as meeting minutes from the Climate Action 100+ Steering Committee shortly thereafter independently confirmed BlackRock understood its membership entailed an expectation to shift its voting in support of climate resolutions.

108.    Internal communications from the climate-activist group Ceres revealed that BlackRock's major clients were exerting pressure on the Company to align its proxy voting with Climate Action 100+ objectives, under threat of withdrawing business and causing revenue losses. According to documents cited in the Antitrust Action, a senior Ceres official warned BlackRock that Ceres was coordinating with others to exert substantial pressure on BlackRock's earnings.[8]

109.    The Director Defendants omitted these critical details from public disclosures to consumers, thereby rendering BlackRock's representations about independent engagements and proxy voting after joining Climate Action 100+ false or misleading, as this nondisclosure concealed the external pressures influencing the Company's decision-making.

---

[8] Antitrust Action, ¶¶ 200-04.

110.    Furthermore, the Director Defendants caused BlackRock to represent that its non-ESG funds were dedicated exclusively to enhancing stockholder value, a claim that directly contradicted the Company's persistent use of proxy votes across all holdings to pressure portfolio companies—including coal producers—to reduce carbon emissions and output, in alignment with its net-zero commitments and involvement in the output-reduction syndicate.

111.    Shortly after BlackRock's entry into Climate Action 100+, an email from a top official at Ceres warned that failure to dramatically alter proxy voting could result in billions of dollars in lost revenue, and following its affiliations with Climate Action 100+ in 2020 and Net Zero Asset Managers Initiative in 2021, BlackRock indeed shifted its voting practices, markedly increasing support for climate proposals consistent with the net-zero agenda.

112.    For example, BlackRock voted for only about 6% of environmental proposals in the 2019–2020 proxy season, but it voted for 64% of environmental proposals in the 2020–2021 proxy season. Similarly, BlackRock voted against fifty-five directors on climate-related issues in the 2019–2020 proxy season, but it voted against 255 directors on climate-related issues in the 2020–2021 proxy season. This dramatic change in BlackRock's voting patterns contradicts BlackRock's public representations that it would continue to make engagement and voting decisions independently despite its climate commitments.

113.    The Director Defendants caused BlackRock's own publicly available voting records to confirm that BlackRock has repeatedly used proxy votes to advance its ESG commitments to reduce greenhouse gas emissions in line with a net zero agenda.

114.    For example: (i) at the October 2021 meeting for Whitehaven Coal, BlackRock voted against all directors up for election because the company's disclosures did not include greenhouse gas ("GHG") reductions targets or alignment with a global aspiration of net zero GHG

emissions by 2050; (ii) BlackRock voted against Exxon Mobil's directors based upon the company's failure to have clear, long-term GHG reduction targets; (iii) BlackRock voted for a 2023 shareholder proposal asking Newmarket Corporation to publish their GHG emissions and set short-, medium-, and long-term emission reduction targets to align business activities with net zero emissions by 2050 in line with the Paris Agreement; (iv) BlackRock voted for a proposal for The Travelers Companies, Inc., to address if and how it intends to measure, disclose, and reduce the GHG emissions associated with its underwriting, insuring, and investment activities, in alignment with the Paris Agreement's 1.5°C goal, requiring net zero emissions; and (v) BlackRock supported a 2023 shareholder proposal for Berkshire Hathaway to issue a report addressing if and how it intends to measure, disclose, and reduce the GHG emissions associated with its underwriting, insuring, and investment activities in alignment with the Paris Agreement's 1.5°C goal, requiring net zero emissions.

115.    Moreover, Defendants directed BlackRock to continue focusing on using engagements to advance its climate agenda. BlackRock reportedly conducted over 1,250 engagements with portfolio companies regarding climate and natural capital in 2023–2024, and over 1,600 such engagements in 2022–2023.

116.    As evidenced above, the Director Defendants caused BlackRock to repeatedly use proxy votes and engagements to promote a comprehensive ESG agenda focused on sustainability and emissions reductions in conformity with BlackRock's climate commitments. These practices contradict BlackRock's public representations that it would independently decide how to vote on proxies and conduct engagements for its non-ESG funds.

## PROXY ALLEGATIONS

117.    BlackRock's 2025 Proxy (for its Annual Meeting of Shareholders on May 15, 2025) seeks stockholder approval for critical matters, including the election of eighteen directors (including Chairman and CEO Defendant Fink and other senior management), advisory approval of executive compensation, and ratification of the independent auditor. It presents an optimistic view of the Company's performance, governance, and strategies, emphasizing record asset inflows ($641 billion net in 2024), growth in AUM ($11.6 trillion), and leadership in sustainable investing. However, given the allegations in the Antitrust Action, which accuse BlackRock's directors and officers of conspiring with competitors State Street and Vanguard to violate federal and state antitrust laws through coordinated output reductions in the U.S. coal industry and the Decision, the 2025 Proxy contains material omissions and misrepresentations. These render it false and misleading under SEC rules (e.g., Regulation S-K Item 303 for known trends and uncertainties, and Item 503 for risk factors), as stockholders were not informed of risks that could adversely affect the Company's financial condition, operations, or the re-election of implicated directors.

118.    The 2025 Proxy omits information concerning pending material antitrust litigation, which exposes BlackRock to substantial financial and operational risks. There is no meaningful discussion concerning the fact that thirteen state attorneys general (Texas, Alabama, Arkansas, Indiana, Iowa, Kansas, Missouri, Montana, Nebraska, Louisiana, Oklahoma, West Virginia, and Wyoming), alleged violations of § 1 of the Sherman Act and § 7 of the Clayton Act. Nor does it discuss how BlackRock's management used its substantial shareholdings (e.g., 13.62% in Peabody Energy, 15.01% in Arch Resources) to form an "output-reduction syndicate" via climate initiatives like Climate Action 100+ and the Net Zero Asset Managers Initiative, artificially suppressing coal production by 18-19% from 2019–2022 despite 21-25% price increases, harming competition and

consumers. The Antitrust Action plaintiffs seek injunctive relief (e.g., divestiture of shares), damages, restitution, and civil penalties up to $10,000 per violation under state laws.

119.    This litigation is material—it could lead to billions in liabilities, forced divestitures disrupting $108.787 billion in coal investments (as of February 2022), and reputational harm. The 2025 Proxy's silence on this, while highlighting "record revenue and operating income" from 2024, misleads stockholders about known uncertainties under Item 303, implying unencumbered growth without regulatory threats.

120.    The 2025 Proxy also portrays BlackRock's Board and management as diligently upholding fiduciary duties of loyalty, care, and good faith, with sections on director independence (83% independent), annual evaluations, and oversight of risks like human capital and sustainability. It nominates directors including defendants Fink and Kapito for re-election without disclosing allegations that they breached these duties by prioritizing "ideological environmental objectives" over stockholder value. Indeed, in stark contrast, the Director Defendants authorized a coordinated scheme to restrain trade, exposing BlackRock to substantial litigation risks, regulatory penalties, and reputational harm, including self-dealing through higher fees from inflated coal prices (e.g., Peabody Energy's profits up 853.9%). By seeking stockholder approval for their re-election and compensation (tied to AUM growth potentially inflated by anticompetitive conduct), the 2025 Proxy falsely implies these fiduciaries acted solely in stockholders' interests.

121.    The 2025 Proxy emphasizes BlackRock's strategy as a "global leader in sustainable investing" across public and private markets, including ETFs and technology like Aladdin, with NGC oversight of corporate sustainability. It states commitments to "deliver investment solutions aligned with client objectives" and highlights acquisitions to "scale and enhance private markets." However, it omits how these ESG/sustainable strategies allegedly involved using non-ESG funds

for climate goals, such as proxy votes against coal company directors for inadequate GHG disclosures (e.g., at NACCO Industries, Arch Resources, Peabody Energy). Indeed, the Antitrust Action and the Decision detail BlackRock's public statements, including defendant Fink's 2022 urging of emission targets and actions, as evidence of an antitrust conspiracy, including ceasing support for coal expansion under Net Zero Asset Managers Initiative (covering 77% of $7.3 trillion AUM). This omission misleads stockholders about the risks of ESG pursuits, including consumer protection claims alleging deception in marketing non-ESG funds while advancing an ESG agenda, potentially leading to further liabilities under state laws including Texas Deceptive Trade Practices Act penalties.

122.    The 2025 Proxy failed to disclose anticompetitive risks in proxy voting and stewardship practices at the Coal Companies. Although the 2025 Proxy mentions Board oversight of "investment stewardship," it provides no details on proxy-voting policies or practices, omitting allegations that BlackRock actively used voting power (e.g., against directors at six of the Coal Companies for "deficient TCFD pillars" or "missing targets") to enforce output reductions.

123.    The sustained Antitrust Action describes that as "policing compliance" in a cartel-like scheme, diminishing incentives for the Coal Companies to compete and creating "irresistible" coercive influence via collective 30%+ ownership in key firms (e.g., 34.19% in Arch Resources). By not disclosing these practices as potential antitrust violations, the 2025 Proxy misrepresents stewardship as benign, hiding risks of invalidating the "passive investor" safe harbor under § 7 of the Clayton Act and exposing the Company to divestiture orders.

124.    The 2025 Proxy understates regulatory and reputational risks tied to coal and energy sector investments. For example, the 2025 Proxy highlights 2024 milestones like $1.5 trillion AUM growth and net inflows without disclosing risks from BlackRock's $108.787 billion coal

investments, which posed a substantial threat to competition in thermal coal and SPRB markets (46% of U.S. production). It omits how privately held producers increased output by 6.1% amid rising prices, while BlackRock-influenced public firms cut 19.2%, leading to "cartel-level profits" for defendants.

125.    The 2025 Proxy deceptively portrays a picture of appropriate corporate governance and compliance. The 2025 Proxy touts robust governance, including majority voting, proxy access, and special meeting rights, with the NGC responsible for corporate sustainability and political activities. It implies compliance with laws through independent oversight but omits allegations of horizontal agreements via Climate Action 100+ (joined January 2020) and Net Zero Asset Managers Initiative (joined March 2021), described in the Antitrust Action and the Decision as compelling evidence of conspiracy marked by parallel conduct with Vanguard and State Street. Moreover, the 2025 Proxy does not mention antitrust compliance programs or Board-level review of these initiatives, misleading stockholders that governance was mitigating legal risks.

126.    These omissions and misrepresentations render the 2025 Proxy materially false and misleading, as the antitrust allegations directly challenge the re-election of implicated directors, the validity of compensation tied to disputed AUM growth, and the sustainability of BlackRock's strategies. Stockholders voting without this information are deprived of key facts to assess management's performance and risks, violating fiduciary disclosure duties. The Decision underscores the plausibility of these claims, further highlighting the Proxy's deficiencies at the time of filing.

## THE ANTITRUST ACTION

127.    This derivative action arises in the context of significant, ongoing federal antitrust litigation that has exposed serious governance failures at BlackRock. In the Antitrust Action,

thirteen state attorneys general filed an amended complaint (subsequently amended again) alleging that the Antitrust Defendants violated § 7 of the Clayton Act and § 1 of the Sherman Act by collectively acquiring substantial ownership stakes in the Coal Companies and using those holdings to substantially lessen competition in domestic coal markets. The Federal Trade Commission (the "FTC") and the US. Department of Justice's Antitrust Division ("DOJ Antitrust Division") filed a joint statement of interest supporting the plaintiffs in the Antitrust Action.

128.    The Antitrust Action alleges that the Antitrust Defendants are "generally the largest shareholders in the Coal Companies" at issue: Peabody Energy, Arch Resources, NACCO Industries, CONSOL Energy, Alpha Metallurgical Resources, Vistra Energy, Hallador Energy, Warrior Met Coal, and Black Hills. Notably, BlackRock is alleged to be the "first or second-largest shareholder" of the Coal Companies. Of the nine Coal Companies, the Antitrust Defendants are alleged to own between 24.94%-34.19% collectively, of seven of them, and 10.85% and 8.30% of the remaining two. This includes the alleged ownership of dominant coal producers Peabody Energy (30.43%) and Arch Resources (34.19%).

129.    The states alleged that the Antitrust Defendants coordinated their actions through climate initiatives, specifically Climate Action 100+ and the Net Zero Asset Managers Initiative; public statements regarding those initiatives that reinforced the goals of those initiatives; and selective voting practices, voting for or against certain directors to further achieve the goals of the climate initiatives. These efforts were intended to and did pressure coal company management to reduce output and align with net-zero emissions goals. According to the antitrust action, this coordination resulted in artificially suppressed coal supply, supra-competitive prices exceeding 20%, and cartel-level profits, all while American consumers paid increased utility costs.

130.    On August 1, 2025, the U.S. District Court for the Eastern District of Texas issued the Decision, a comprehensive sixty-one-page opinion largely denying the Antitrust Defendants' motions to dismiss. In doing so, the court made several significant legal rulings with far-reaching implications for institutional investors' conduct and potential antitrust liability.

131.    The Decision establishes several critical legal principles applicable to the institutional investors' conduct, especially with respect to BlackRock.

132.    First, the court explicitly held that "horizontal shareholding"—where institutional investors acquire large overlapping share interests in competing firms—is a viable theory of liability under § 7 of the Clayton Act. The court rejected defendants' arguments that partial stock acquisitions by institutional investors fall outside the statute's scope, holding that § 7's text plainly covers acquisitions of "the whole or any part" of stock in competing companies.

133.    Second, the court ruled that the Clayton Act's "passive investor" safe harbor is unavailable to investors who "purposely employ" their stock through proxy voting or otherwise to "bring about, or attempt to bring about, the substantial lessening of competition." The court found that defendants' alleged conduct—joining climate initiatives, making public commitments to reduce coal output, proxy voting against directors for inadequate climate disclosures, and engaging directly with company management—constituted active "use" of stock that removes safe harbor protection.

134.    Third, under the Sherman Act, the court held that parallel conduct combined with "plus factors"—including shared moral imperatives, economic motives, and opportunities to coordinate—can plausibly establish an unlawful agreement among competitors. The court concluded that the Antitrust Defendants' near-simultaneous joining of climate initiatives (BlackRock and Vanguard on the exact same day), which "promot[ed] goals that naturally resulted

in the reduction of coal output," was in and of itself, "strong evidence of 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'"[9] This conduct coupled with similar public statements and coordinated engagement tactics, sufficed to demonstrate parallel conduct. The court also concluded that the plaintiffs had demonstrated three "plus factors" that "enhance Defendants' parallel conduct and push this claim across 'the line between possibility and plausibility.'"[10] These three plus factors are: a shared moral motive to conspire, an economic motive to conspire given that the Coal Companies profits were alleged to have soared in 2022 when prices increased massively while output did not, and pressure exerted on the Coal Companies to disclose competitive information pertaining to their future output.

135.    Fourth, the court accepted plaintiffs' allegations that between 2019 and 2022, coal prices increased by 21-25% while the Coal Companies' collective output decreased by 18-19%, even as privately held coal companies increased production by 6.1%. The court found these allegations—showing increased prices and decreased output—sufficient to demonstrate direct evidence of anticompetitive harm under both the Clayton Act and Sherman Act.

136.    Fifth, the court held that agreements to compel disclosure of competitive information about future production targets, in addition to being a plus factor, could also independently constitute a Sherman Act violation, as such disclosures allow competitors to coordinate output decisions and pricing.

137.    Notably, the court explicitly rejected arguments that would insulate institutional investors from antitrust scrutiny. The court held there is "no basis in the statute 'for treating an institutional investor differently from other investors'" and that permitting proxy voting and

---

[9] *See* Decision at 33-34 (citation omitted).

[10] *Id.* at 34 (citation omitted).

engagement without consequence would not "gut" the safe harbor.[11] Rather, the court explained that "[t]he problem arises when 'holders of competing companies . . . discourage competition among their investments in a manner that results in harm to consumers or businesses.'"[12]

138.    The court further emphasized that antitrust law "does not yield to the prevailing social policy of the day," holding that "even well-intentioned moral motives are no excuse for antitrust violations."[13] The court noted that while the Antitrust Defendants allegedly joined climate initiatives believing they were morally compelled to fight climate change, such motivations provided no defense to anticompetitive conduct. As the Supreme Court has held, a restraint of trade "is not saved because, on some ultimate social reckoning of social or economic debits and credits, it may be deemed beneficial."[14]

139.    Finaly, in addition to the antitrust claims, the court allowed consumer protection claims against BlackRock to proceed under Texas, Montana, Iowa, and Nebraska law. These claims alleged that BlackRock deceived consumers by marketing certain investment funds as not following an "ESG investment strategy" while simultaneously using the power of shares held in those funds—through proxy voting and engagement—to advance an ESG agenda consistent with the climate initiatives. The court found that "investment strategy" could reasonably be understood by consumers to include proxy voting and engagement activities, making BlackRock's representations potentially misleading.

140.    The Decision also quoted with approval the principle that federal antitrust law serves as "a central safeguard for the Nation's free market structures" and is "as important to the

---

[11] Decision at 26-27 (citation omitted).

[12] *Id.* at 27 (citation omitted).

[13] *Id.* at 1, 35.

[14] *Id.* at 35 (citing *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 371 (1963)).

preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."[15] And the court noted that the FTC and DOJ Antitrust Division's joint statement of interest supporting the states' claims explained that "[p]artial acquisitions that do not result in control may nevertheless present significant competitive concerns."[16]

141.    The Court's comprehensive analysis and denial of the motions to dismiss demonstrate that the Antitrust Defendants, including BlackRock, face substantial legal exposure when they coordinate their actions across competing portfolio companies to advance noneconomic objectives that harm competition. The Decision demonstrates that proxy voting, engagement activities, and participation in industry initiatives can constitute actionable use of stock that triggers antitrust liability; and that such activities are not protected merely because they are characterized as typical asset manager behavior or are motivated by ESG objectives.

## **DAMAGES TO BLACKROCK**

**Defendants' Agenda Resulted in Tangible Financial Consequences for BlackRock Through a Series of High-Profile State-Level Divestments**

142.    In December 2022, Florida's Chief Financial Officer Jimmy Patronis announced the divestment of $2 billion in state assets from BlackRock. Mr. Patronis called BlackRock's ESG strategy a "social engineering project" that has "nothing to do with maximizing returns,' stating that he did not trust the Company's ability to deliver for the state. BlackRock, in response, highlighted its strong past returns for Florida taxpayers and expressed concern that political initiatives of this nature "sacrifice access to high-quality investments and thereby jeopardize

---

[15] Decision at 1 (first quoting *N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 502 (2015); and then quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972)).

[16] *Id.* at 26 (citation omitted).

returns."[17]

143.    Texas has been a major source of pressure. The Texas Permanent School Fund, which manages $53 billion in assets, pulled an $8.5 billion investment from BlackRock to comply with Senate Bill 13, a state law that requires the state to stop doing business with companies that "boycott" the fossil fuel industry.[18]

144.    Missouri's divestment highlights a specific flashpoint in the conflict: proxy voting. State Treasurer Scott Fitzpatrick announced the pulling of $500 million in state pension funds from BlackRock after the Company refused a demand from the Missouri State Employees' Retirement System board to abstain from voting proxies on its behalf.[19] Mr. Fitzpatrick stated that BlackRock had "demonstrated that they will prioritize advancing a woke political agenda above the financial interests of their customers."[20]

145.    West Virginia's State Treasurer Riley Moore divested $400 million from BlackRock in June 2022, labeling its ESG policies as discriminatory against coal and fossil fuels. Mr. Moore argued that these commitments violated fiduciary standards by artificially limiting portfolio diversification and returns, particularly in a coal-reliant state.

146.    Louisiana's Treasurer John Schroder pulled $794 million from BlackRock in June 2022, citing similar concerns over ESG mandates that restrict fossil fuel exposure. The state

---

[17] Mark Segal, *Florida Pulls $2 Billion from BlackRock Due to ESG Investing*, ESG TODAY  (Dec 1, 2022), https://www.esgtoday.com/florida-pulls-2-billion-from-blackrock-due-to-esg-investing/.

[18] Zoya Mirza, *Texas Schools Fund Pulls $8.5B from BlackRock over ESG*, ESG DIVE (Mar. 21, 2024), https://www.esgdive.com/news/texas-schools-fund-pulls-8B-from-blackrock-over-esg/711008/.

[19] Press Release, Missouri State Treasurer, Treasurer Fitzpatrick Announces MOSERS Has Pulled $500 Million in State Pension Funds from BlackRock (Oct. 18, 2022), https:// treasurer.mo.gov/newsroom/news-and-events-item?pr=80669a5f-5c6b-491f-a0f0-6abe4c012604.

[20] *Id.*

viewed BlackRock's climate-focused voting and investment exclusions as prioritizing ideology, potentially leading to suboptimal performance in energy assets.

147.    Arkansas's Treasurer Dennis Milligan divested $125 million from BlackRock money market funds in March 2022, part of a broader anti-ESG push under state law. The rationale focused on BlackRock's fossil fuel divestment policies, which were seen as harming returns for public employees' retirement funds.

148.    Other states have taken action, including South Carolina, which divested $200 million, and Utah and Arkansas, which committed to pulling $100 million and $125 million, respectively.

149.    While facing intense pressure from the political right, BlackRock is simultaneously targeted by environmental and investor activist groups who accuse the Company of "greenwashing." These critics point to a significant "gap between finance leaders[']" rhetoric and proxy-voting records. They argue that despite defendant Fink's public and loud commitments to addressing climate risk, BlackRock's actions do not align with its statements. One report on asset managers' voting records found that proxy voting in 2021 was "insufficient to the scale and urgency of the climate crisis," with BlackRock and others voting against critical shareholder resolutions that "torpedo[ed] efforts to fight the climate crisis."[21]

**Financial Damages from Antitrust Liability**

150.    In addition to the damages caused by divestures, the Decision determined that plaintiffs plausibly alleged an unlawful agreement to restrain trade, potentially leading to direct monetary penalties and compensatory awards. Specific risks include the following:

---

[21]    *See* #BlackRocksBigProblem, Reports, *ESG & Shareholder Proxy Voting*, available at https://blackrocksbigproblem.com/reports/category/esg/.

a.  Treble Damages Under Federal Antitrust Laws: Pursuant to 15 U.S.C. § 15, successful claims could result in tripled actual damages for harms such as inflated energy prices affecting consumers and states. The Antitrust Action quantifies anticompetitive effects, including a 19.2% reduction in thermal coal output amid 25.52% price increases from 2019 to 2022, which could form the basis for substantial calculations.

b.  Civil Penalties and Restitution Under State Laws: The plaintiffs seek penalties (e.g., up to $10,000 per willful violation under certain statutes like the Texas Deceptive Trade Practices Act) and restitution for consumer losses, including higher utility bills. The Decision denying the dismissal of most state claims (dismissing only three of twenty-one counts) heightens exposure.

c.  Injunctive-Relief Costs: Remedies may include divestiture of coal company shares (e.g., BlackRock's holdings in companies like Peabody Energy at 13.62%), disrupting AUM valued at over $108 billion in coal investments as of February 2022. This could necessitate portfolio restructuring, incurring transaction fees, and lost revenue.

151.  Even absent an adverse judgment, the ongoing Antitrust Action imposes immediate costs. Delaware law permits indemnification of directors under 8 DEL. C. § 145, but the Company bears initial legal fees for defense, expert witnesses, and discovery. With the motions to dismiss denied, the case proceeds to potentially protracted proceedings, including jury trial as demanded, escalating expenses. Public filings indicate BlackRock's involvement in similar disputes has historically required significant resources.

152.    Damages also include reputational and business harm from the public outcry. Allegations of prioritizing "environmental stewardship" over market competition have fueled criticism, particularly from conservative stakeholders and media, portraying the directors' conduct as ideologically driven market manipulation. This outcry exacerbates the potential for client withdrawals and reduced AUM.

153.    There are additional regulatory and compliance risks. The FTC and the DOJ Antitrust Division filed a statement of interest on May 22, 2025, endorsing the plaintiffs antitrust theory and signaling potential federal investigations.

## DEMAND FUTILITY ALLEGATIONS

**Committee Involvement**

154.    Plaintiff brings this derivative action on BlackRock's behalf pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and § 327 of the Delaware General Corporation Law. Plaintiff has not made a pre-suit demand on the Company's Board because such demand would be futile.

155.    The 2025 Proxy confirms that the Board has ultimate responsibility for risk oversight, with the Audit Committee, MDCC, NGC, and Risk Committee assisting. The 2025 Proxy also details specific committee remits and memberships, establishing particularized duties and knowledge for each director. These committee assignments are not merely titles; they represent legally defined roles that impose heightened fiduciary duties and channels of information. The Director Defendants, by accepting these roles, are charged with a duty to monitor and respond to critical risks, including legal, regulatory, and competitive threats. The existence of these committees and their specific oversight functions—which include receiving routine reports from senior management on compliance and risk management—demonstrates that the Board was not

only aware of but was directly involved in the oversight of the strategic initiatives at the heart of the alleged misconduct.

156.    The Company is governed by several committees. First, pursuant to the Audit Committee's Charter, the Audit Committee oversees BlackRock's "compliance . . . with legal and regulatory requirements" and receives compliance, financial-crime, litigation/regulatory, and risk-management reports from the Global Head of Compliance, Chief Legal Officer, and other senior control functions. Board members serving on the Audit Committee are defendants Daley, Johnson, Vestberg, and Wilson. These defendants' explicit remit to oversee legal and compliance risks meant they were in a position to know about the alleged antitrust violations and deceptive practices.

157.    Second, the Risk Committee oversees company-wide risk assessment and receives reports on "risks associated with regulatory trends and public policy developments," plus reviews the Risk Factors in Annual Reports. Board members serving on the Risk Committee are defendants Daley, Johnson, Robbins, Vestburg, Wagner, and Wilson. These defendants' duties included proactively assessing regulatory and competitive risks directly related to the alleged scheme to reduce coal output and misrepresent investment strategies.

158.    Third, the NGC periodically reviews corporate goals and programs relating to sustainability, and public policy and advocacy activities (including priorities and trade associations), and it leads shareholder engagement on governance and sustainability. The Board and NGC are periodically briefed by management on advocacy initiatives. Board members serving on the NGC are Defendants Ford, Freda, Gerber, Mills, Nasser, Nixon, and Peck. These defendants' role in overseeing sustainability and advocacy programs ties them directly to the alleged collusion via initiatives such as Climate Action 100+ and Net Zero Asset Managers Initiative.

159.    Finally, the Executive Committee possesses "all the powers of the Board" between meetings. Board members serving on the Executive Committee are Defendants Fink, Daley, Ford, Gerber, and Wagner. These Defendants' unique authority to direct, ratify, or stop the challenged course of conduct between full Board meetings makes their failure to act particularly significant.

**Red Flags Demanded Immediate Attention**

160.    The Board as a whole and directors sitting as members of the specific committees detailed above were presented with numerous red flags signaling that the Company was violating antitrust rules and regulations by engaging in a coordinated scheme to substantially lessen competition in the coal markets, in violation of § 7 of the Clayton Act, 15 U.S.C. § 18, and various other laws. Each red flag should have driven Board members to take affirmative action to correct the Company's conduct.

161.    More specifically, as alleged in the Antitrust Action, BlackRock used its immense shareholdings and proxy votes to enforce carbon-output restrictions at the Coal Companies, including by voting against directors and threatening divestment to coerce climate targets. Specific examples of this behavior are alleged to have occurred at companies such as NACCO Industries, Arch Resources, Peabody Energy, and CONSOL Energy.

162.    BlackRock dramatically changed voting patterns after joining Climate Action 100+ and Net Zero Asset Managers Initiative, supporting many more environmental proposals and voting against 255 directors on climate-related grounds in a single proxy season—directly contradicting its public representations of independent voting.

163.    BlackRock deceived its customers by misrepresenting its investment strategies. Widely held iShares non-ESG funds were marketed as not seeking "to follow a sustainable, impact or ESG investment strategy," while BlackRock allegedly used all fund votes, including those of

non-ESG funds, to advance its climate-targeting objectives. This demonstrates a clear mismatch between the Company's public messaging and its actual conduct.

164.    Members of the Board were presented with additional red flags signaling that the Company was violating antitrust laws but failed to respond, further demonstrating that they face the risk of substantial liability from the Antitrust Action. For example:

a.    The Company joined Climate Action 100+ with an acknowledged expectation to "shift [BlackRock's] voting to support climate resolutions," contradicting claims of independent voting.

b.    The Board was presented with dramatic voting shifts after Climate Action 100+/Net Zero Asset Managers Initiative: from ~6% support for environmental proposals (2019–2020) to 64% (2020–2021) and votes against 255 directors on climate issues (up from fifty-five).

c.    Defendant Fink's statement "asking companies to set short-, medium-, and long-term [GHG] targets," evidences outcome-engineering inconsistent with "independent" voting claims.

d.    Net Zero Asset Managers Initiative commitments to implement stewardship/engagement and policy advocacy "across all assets under management" with interim targets toward 100% AUM—company-wide scope touching non-ESG funds.

e.    Public "setting the record straight" webpage and Attorneys General response letter denying outcome-engineering, while contemporaneous statements/directives demanded targets—conflicting messaging signaling consumer-protection risk.

f.   Non-ESG funds marketed as not following ESG strategies, yet engagement/proxy voting used to pursue ESG outcomes—a mismatch visible in fund fact sheets and prospectuses. Specific examples of non-ESG index products (e.g., Total U.S. Stock Market, Russell 3000) holding substantial coal-exposed positions while advertised as non-ESG funds, yet used in company-wide ESG stewardship.

g.   Board-level escalation posture: BlackRock warned it would "discipline management" and flag holdings lacking alignment—coercive leverage consistent with output-reduction allegations.

165.   These actions, occurring over four years amid rising coal prices and readily available public information, constitute "red flags" that demanded Board intervention. The directors' inaction or active participation exposes them to liability because a failure to address known regulatory and market risks in high-stakes industries like asset management voids the protections of the business judgment rule.

166.   The pleaded, particularized assignments, admissions of Board-level oversight, and committee-level reporting channels—coupled with the detailed red flags—establish that at least a majority of the directors face a substantial likelihood of non-exculpated liability for breaching their fiduciary duties of care and loyalty.

167.   Specifically, a majority of the Board faces a substantial likelihood of liability. Directors on oversight committees bear heightened liability, as their roles required affirmative monitoring of antitrust exposure and other legal risks.

**Audit Committee Members' Liability**

168.    As members of the Audit Committee, Defendants Daley, Johnson, Vestberg, and Wilson are subject to potential liability. Given their express remit over compliance and their receipt of detailed reports, these defendants had actual or constructive knowledge that stewardship was being used as an outcome-forcing mechanism with antitrust and consumer deception risks. Their failure to halt or correct the conduct supports a credible inference of bad-faith oversight.

**Risk Committee Members' Liability**

169.    As members of the Risk Committee, Defendants Daley, Johnson, Robbins, Vestberg, Wagner, and Wilson are subject to potential liability. Given the Antitrust Action's detailed allegations of coordinated output-reduction and fund-marketing mismatches, these were quintessential regulatory and public-policy risks squarely within the Risk Committee's remit. Their knowing inaction or approval supports Prong-2 exposure.

170.    Moreover, the entire Board is incapable of impartial consideration because a majority cannot exercise disinterested judgment due to entanglement in the wrongdoing. All eighteen directors approved or acquiesced in the challenged conduct through Board-level strategy, compensation, and oversight failures. The Board's collective participation in the sustainability and investment strategies—evidenced by approvals of net-zero initiatives and executive pay tied to asset growth—implicates every member in causing or failing to stop the antitrust violations and deceptions.

**Executive Committee Members' Liability**

171.    As members of the Executive Committee, Defendants Fink, Daley, Ford, Gerber, and Wagner all face the substantial risk of liability based on their involvement in allegations underlying the Antitrust Action because this committee has "all the powers of the Board" between

meetings, members cannot credibly claim inability to act; they were uniquely positioned to direct, ratify, or stop the challenged course. Coupled with the Antitrust Action's allegations that BlackRock asked companies to set climate targets and used proxy voting to coerce compliance, these members face a substantial likelihood of liability for causing or knowingly permitting this conduct.

## CLAIMS FOR RELIEF

### COUNT I

**Against the Director Defendants for
Violations of § 14(a) of the Exchange Act**

172.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

173.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title." 15 U.S.C. § 78n(a)(1).

174.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

175.    Under the direction and watch of Defendants Fink and Kapito, and other members of the Board and its committees, the 2025 Proxy failed to disclose that the Board and its committees were not adequately exercising their risk-oversight functions. The 2025 Proxy also failed to disclose that the Company was actively engaged in a conspiracy to unlawfully restrain trade and coerce a reduction in coal output. The 2025 Proxy failed to disclose, *inter alia*, that: (i) BlackRock was a defendant in a pending, material antitrust lawsuit brought by multiple U.S. states plausibly alleging violations of federal and state antitrust laws, including the Sherman and Clayton Acts, and consumer protection laws; (ii) the alleged unlawful conduct, if successful, could expose BlackRock to billions in liabilities and forced divestitures of its coal investments; (iii) the Director Defendants breached their fiduciary duties by engaging in this scheme, prioritizing nonfinancial, ideological goals over stockholder value; and (iv) the Defendants' conduct was not a passive investment strategy, but a deliberate effort to use the Company's proxy voting power and influence to enforce a market-manipulating agenda. As a result of these material misstatements and omissions, BlackRock stockholders were deprived of crucial information when voting on the matters set forth for stockholder determination in the 2025 Proxy, including the re-election of implicated directors.

176.    In the exercise of reasonable care, the Director Defendants, including, but not limited to, Defendants Fink and Kapito, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff and other stockholders in voting on the matters set forth for stockholder determination in the 2025 Proxy.

177.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2025 Proxy and its prior proxy statements, which sought

the re-election of directors and ratification of corporate-governance policies while omitting the material facts of the antitrust conspiracy.

178.    Plaintiff, on behalf of BlackRock, has no adequate remedy at law.

## COUNT II

### Against the Director Defendants for Breach of Fiduciary Duties

179.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

180.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BlackRock's business and affairs.

181.    Each of the Director Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision by authorizing and overseeing the alleged unlawful conduct.

182.    The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Director Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of BlackRock.

183.    In breach of their fiduciary duties owed to BlackRock, the Director Defendants willfully or recklessly caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (i) BlackRock had entered into an unlawful agreement with competitors State Street and Vanguard to use its substantial shareholdings in U.S. coal producers to suppress output and restrain trade; (ii) the Company was deceiving its customers by marketing funds as "non-ESG" while using the assets and voting power of those funds to advance an ESG agenda; and (iii) the Defendants were motivated by nonfinancial,

ideological goals that caused foreseeable financial and reputational harm to the Company, including the divestment of funds by state treasurers and pension funds. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

184.    In further breach of their fiduciary duties, the Director Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

185.    In further breach of their fiduciary duties, the Director Defendants failed to exercise adequate oversight over the Company's risk management despite being on notice or recklessly failing to know that its ESG and proxy voting practices were exposing the Company to significant antitrust and consumer protection litigation.

186.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

187.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, BlackRock has sustained and continues to sustain significant damages, including legal costs, loss of AUM, and reputational harm. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

188.    Plaintiff, on behalf of BlackRock, has no adequate remedy at law.

## COUNT III

### Against the Director Defendants for Unjust Enrichment

189.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

190.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Director Defendants were unjustly enriched at the expense of, and to the detriment of, BlackRock.

191.    The Director Defendants either benefited financially from the improper conduct, received bonuses, stock options, or similar compensation from BlackRock that was tied to the performance or artificially inflated valuation of the Company's AUM, or received compensation or other payments that were unjust in light of the Director Defendants' bad-faith conduct. This includes lavish compensation, benefits, and other payments provided to the Director Defendants who breached their fiduciary duties to the Company.

192.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Director Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

193.    Plaintiff, on behalf of BlackRock, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of BlackRock and that Plaintiff is an adequate representative of the Company;

B.    Finding that any demand upon the Board concerning the wrongdoing complained of herein would have been futile;

C.      Determining and awarding to BlackRock the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.      Directing BlackRock and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect BlackRock and its stockholders from a repeat of the damaging events described herein;

E.      Awarding BlackRock restitution from the Individual Defendants;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorney's and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedures and the Seventh Amendment to the United States Constitution, Plaintiff demands a trial by jury on all issues so triable.


Dated: February 9, 2026                  SBAITI & COMPANY PLLC

                                         */s/ Griffin S. Rubin*
                                         Mazin A. Sbaiti (Texas Bar No. 24058096)
                                         Griffin S. Rubin (Texas Bar No. 24121809)
                                         3102 Maple Avenue, Suite 400
                                         Dallas, Texas 75201
                                         Telephone: (214) 432-2899
                                         Facsimile: (214) 853-4367
                                         Email: mas@sbaitilaw.com
                                                 gsr@sbaitilaw.com

LEVI & KORSINSKY, LLP
Gregory M. Nespole (*pro hac vice* forthcoming)
Correy A. Suk (*pro hac vice* forthcoming)
Daniel Tepper (*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: gnespole@zlk.com
        csuk@zlk.com
        dtepper@zlk.com

ROBBINS LLP
Brian J. Robbins (*pro hac vice* forthcoming)
Michael J. Nicoud (*pro hac vice* forthcoming)
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
Email: brobbins@robbsinllp.com
        mnicoud@robbinsllp.com

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Joseph Crognale, hereby declare as follows:

I am the plaintiff in this action.  I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 2/4/2026 _____

DocuSigned by:

*Joseph Crognale*
69452AE7D25B4F9...
_____
JOSEPH CROGNALE